# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

―――――――――――――――――――――――

MARCELO CALLI,                  :
              Plaintiff,      :          No. 5:14-cv-5292
        v.                 :
                          :
ARC MAINTENANCE, INC., CRAIG D.    :
COTURE,[1] SCOTT LUTZ, and GARY LUTZ, :
             Defendants.    :

―――――――――――――――――――――――

## MEMORANDUM
**Defendants' Motion for Summary Judgment, ECF No. 24 – Granted in Part/Denied in Part**

**Joseph F. Leeson, Jr.**                                            **January 21, 2016**
**United States District Judge**

## I.       INTRODUCTION

       On September 16, 2014, Plaintiff Marcelo Calli filed a Complaint against Defendants

ARC Maintenance, Inc. ("ARC"), and three of its employees Manager Craig D. Couture

("Couture"), President Scott Lutz ("S. Lutz"), and Vice President Gary Lutz ("G. Lutz") alleging

that Defendants failed to pay him overtime compensation and retaliated against him after he

complained about Defendants' failure to follow the provisions of the Fair Labor Standards Act of

1938, 29 U.S.C. §§ 201-209, ("FLSA"), regarding overtime compensation and wage and hour

violations, resulting in his constructive discharge.  On July 15, 2015, Defendants filed a Motion

for Summary Judgment.  Defs.' Mot. Summ. J., ECF No. 24.  For the reasons set forth herein,

the Motion is granted with respect to the Pennsylvania's Wage Payment and Collection Law

("WPCL") claim and the claim for unjust enrichment, but denied as to the overtime claims under

the FLSA and Pennsylvania's Minimum Wage Act ("PMWA") claim. Additionally, because the

---

[1] The caption of the Complaint lists Craig D. "Coture," but the body of the Complaint refers to Craig D. "Couture." This spelling distinction is maintained throughout the filings by both parties.  As it appears that the correct spelling is "Couture," the Memorandum will use this spelling.

FLSA retaliation claim was dismissed with prejudice on January 7, 2016, the request for summary judgment on this claim is denied as moot.

## II.     BACKGROUND

### A.     Undisputed Facts

Since 1989, ARC has been engaged in the business of contracting with retail stores to provide cleaning operations, typically performed during off-peak hours, i.e. from midnight until mid-morning.  Defs.' Stmt. Facts ¶¶ 1-2, ECF No. 26, admitted in Pl.'s Resp. Defs.' Stmt. Facts ¶¶ 1-2, ECF No. 34.  The cleaning services performed at stores with which ARC has contracts are performed by subcontractors hired by ARC.  Id. at ¶ 3.

Plaintiff was hired by ARC as a District Supervisor on January 2, 2008.  Id. at ¶ 4. Plaintiff was hired as a salaried exempt employee, starting at $700.00 per week.  Id. at ¶ 19. Throughout the time he was employed at ARC, Plaintiff received six periodic pay increases, and had a salary of $888.12 per week at the time he resigned.  Id. at ¶ 7.

During his employment with ARC, Plaintiff was never demoted nor was his salary ever reduced.  Id. at ¶ 11.  Plaintiff's job responsibilities were never reduced and his work hours were never changed.  Id. at ¶¶ 12-13.  Plaintiff never told anyone at ARC that he had reported the company to any governmental agency, including the Department of Labor.  Id. at ¶ 14.  Plaintiff was never explicitly threatened with being fired.  Id. at ¶ 16.

 Plaintiff, as with the other District Supervisors, was one of the principal people at ARC who interacted with the retail store managers and had the most interaction with the subcontractors they were supervising.  Id. at ¶ 21.  Plaintiff trained new District Supervisors while he was at ARC.  Id. at ¶ 24.

On July 1, 2008, Plaintiff wrote in his ARC self-appraisal: "I make decisions on my own most of the time, however I totally inform to my supervisor so I manage within company policies and standards." Id. at 30 (quoting Self-Appraisal, Ex. F, ECF No. 29-5).  On his December 29, 2008 self-appraisal with ARC, plaintiff wrote: "Giving the subs and employees new ideas for job improvements. . . Even though some subs didn't like to be told their faulty actions I never hold personal issues against anybody." Id. at ¶ 29 (quoting Self-Appraisal, Ex. F, ECF No. 29-5).  On January 11, 2010, Plaintiff wrote in his ARC self-appraisal: "The result of my work quality can be seen at the stores I am responsible for . . . I try to solve issues on the spot due to the volume of work . . . I feel comfortable making desitions [sic] and working independently though I always check with my supervisors." Id. at ¶ 28 (quoting Self-Appraisal, Ex. F, ECF No. 29-5). Plaintiff, wrote in his January 7, 2011 ARC self-appraisal: "Most of the stores I supervise are usually up to company standards . . . Most of the year I had over 20 stores to visit bi-weekly. I managed mostly properly. . . Always trying to develop ideas and/or new ways to do my and others job specially [sic] when I train others." Id. at ¶ 27 (quoting Self-Appraisal, Ex. F, ECF No. 29-5).

When seeking new employment after resigning from his position at ARC, Plaintiff wrote on his resume: "Personable [Manager] and self-motivated team player . . . Skilled [Supervisor] with more than [5] years experience in housekeeping  and custodial maintenance . . . Management professional effective at building highly-motivated teams, as well as leading cross-functional teams in a fast-paced environment.   Dynamic Customer Service Manager who leads diverse teams to achieve company goals. . . well-versed in materials management and inventory reconciliation . . . Demonstrated team leader with excellent staff management skills." Id. at ¶ 31 (quoting Plaintiff's Resume, Ex. G, ECF No. 29-6)  Plaintiff listed his skills to include "Project

3

management, Multi-operations management, Quality control, Personnel management, Logistics management, and Multi-site operations expert." Id. at ¶ 32 (quoting Plaintiff's Resume, Ex. G, ECF No. 29-6). Plaintiff's resume at this time listed only one job, at a warehouse in Argentina, other than at ARC, at which he could have been involved in "project management," "multi-operations management," and/or "personal management." Id. at ¶ 33. Plaintiff's resume stated that his work history for ARC was that he would "[c]heck work quality of janitorial service rendered to supermarkets and other retail facilities. Meeting customer managers to verify work standards levels [sic] and make any necessary corrections . . . ." Id. at ¶ 34 (quoting Plaintiff's Resume, Ex. G, ECF No. 29-6). When seeking new employment after resigning from his position at ARC, Plaintiff wrote in response to an advertisement: "Your best candidate for the job! Experienced [sic] 5+ years as District Supervisor was making $880.00 weekly driving company vehicle checking work quality at more than 20 locations . . ." Id. at ¶ 36 (quoting Plaintiff's emails, Ex. H, ECF No. 29-7). He also stated "I used [sic] to supervise the janitorial service of Supermarkets and deliver chemicals for over 20 locations biweekly. . . ." and that "I am a former District Supervisor for a janitorial company that was offering me a manager position, have passed the online test for operations manager and I have the document . . . ." Id. at ¶¶ 37-38 (quoting Plaintiff's emails, Ex. H, ECF No. 29-7).

### B.    Additional Undisputed Facts and/or Facts Alleged by Plaintiff

Plaintiff entered into a confidentiality and non-compete agreement with ARC on February 1, 2010. Agreement, Pl.'s Ex. 1, ECF No. 35-1. The agreement, which restricts Plaintiff's ability to engage in competition with, or to solicit any customer, client, or account of, ARC for a period of twenty-four months after employment terminates, was made in

consideration for Plaintiff's promotion to District Supervisor and an increase in compensation. Id. at 1 and ¶ 1.  The agreement provides that Plaintiff's employment shall be at will.  Id. at ¶ 2.

Plaintiff complained to Couture that he should have been receiving more pay for the work that he was doing, after his normal work hours and on Saturdays and Sundays.  Pl.'s Resp. Defs.' Stmt. Facts ¶ 54.[2]  Specifically, Plaintiff made complaints to S. Lutz and Couture about how ARC's sub-contractors were being "abused."  Id. at ¶ 55.  Plaintiff submits that this is the protected activity in connection with his retaliation claim and that his complaints had the direct correlation to and effect of erasing his opportunity for a promotion to Manager.  Id. at ¶ 55. Plaintiff avers that working conditions became so intolerable that he could no longer work for a company that he felt treated its workers like "slaves", "hired undocumented immigrants, because they can abuse them. They abuse the guy that doesn't read and write and then that's –terrible. I cannot do that. And I don't – want to…"  Id. at ¶ 56.

Plaintiff was hired by ARC as an account supervisor in September 2007, where he worked until April 26, 2013.  Pl.'s Dep. 6:19-7:15, 14:14-24, Feb. 19, 2015, ECF No. 35-2.  The title of an account supervisor was later changed to district supervisor, but the job duties and pay remained the same.  Pl.'s Dep. 7:16-10:1, Feb. 19, 2015.  Plaintiff's salary was never decreased while he was employed by ARC; rather, he received periodic pay increases.  Pl.'s Dep. 14:24-15:18, Feb. 19, 2015.

During his first three months with ARC, Plaintiff underwent training in every part of the job, including sweeping, mopping, waxing floors, pressure washing, etc., so that he could supervise in these areas.  Pl.'s Dep. 65:5-19, Feb. 19, 2015.  Plaintiff would train ARC employees and subcontractors on how to complete the work.  Pl.'s Dep. 34:7-16, Feb. 19, 2015.

---

[2] The testimony Plaintiff cites to support this alleged fact is actually Plaintiff's deposition testimony regarding complaints he made to Ms. Lechtner at the Department of Labor, which ARC was unaware of.  Pl.'s Dep. 226:1-25, Feb. 19, 2015.

Plaintiff also trained all of ARC's supervisors.  Pl.'s Dep. 189:15-22, Feb. 19, 2015.  Plaintiff did not have hiring or firing control, but would make recommendations to Couture as to the subcontractors.  Pl.'s Dep. 193:7-195:13, Feb. 19, 2015.

As part of his duties, Plaintiff would travel to the stores to check to see if the work had been completed and to check on the quality of the work done by the subcontractor.  Pl.'s Dep. 33:1-24, Feb. 19, 2015.  If there was a problem with a subcontractor, it was Plaintiff's responsibility to "try to fix it" and to report the issue to Couture.  Pl.'s Dep. 192:7-194:12, Feb. 19, 2015.  Plaintiff testified that he did not have authority to hire and/or fire, but would make recommendations to Couture on how to handle a problem.  Pl.'s Dep. 193:22-194:25, Feb. 19, 2015.[3]

S. Lutz testified that the only manual labor requirements of Plaintiff's job description is that ARC "recommend[s] that when -- if something's not being done correctly, the best way to correct that is to show the person what it is that you want done correctly and how to do it."  S. Lutz's Dep. 49:12-22, Feb. 25, 2015, Ex. 4, ECF No. 35-3.  Couture testified that Plaintiff's day-to-day responsibilities, aside from walking the location and dropping off supplies, did not involve manual labor; rather, Plaintiff's duty was to supervise.  Couture's Dep. 66:5-21, May 28, 2015, Ex. 7, ECF No. 35-6.  Although Plaintiff was expected to train employees on how to mop, for example, Couture testified that this entailed showing the subcontractors how to mop in a small area, not the entire edge area of a store, and then watching to make sure things were done correctly.  Couture's Dep. 68:3-16, May 28, 2015.

Plaintiff drove a company car to the stores he supervised, Pl.'s Dep. 22:16-23, Feb. 19, 2015, and was responsible for bringing the chemicals and supplies for the sub-contractors to use

---

[3] S. Lutz testified that ARC has a discipline process that has to be followed before a subcontractor can be terminated, but that Plaintiff did have the unilateral authority to fire a subcontractor if that process is followed.  S. Lutz's Dep. 55:2-57:11.

in cleaning, Pl.'s Dep. 177:21-178:16, Feb. 19, 2015. Plaintiff's basic daily manual labor, aside from driving the truck, was to "unload everything, put it in a cart from the store, take it inside," unload stuff, fill up and mix chemicals, bring the old empty bottle out for collection, check on the machines, and attempt to fix the machines." Pl.'s Dep. 72:21-73:6, April 29, 2015. Plaintiff supervised more than twenty stores. Pl.'s Dep. 182:2-9, Feb. 19, 2015. Plaintiff took QA sheets to each store he was supervising and was responsible for identifying any quality control issues or concerns about the subcontractors he was supervising. Pl.'s Dep. 24:10-22, Feb. 19, 2015. Plaintiff had direct contact with store managers. Pl.'s Dep. 23:4-24-5, Feb. 19, 2015.

Plaintiff detailed some of the occasions when he had to help the subcontractors' do their cleaning work. Pl.'s Dep. 178:13-189:18, Feb. 19, 2015. Plaintiff testified, for example, about a time when he had to clean one side of a Redner's supermarket because the subcontractor was doing the edges. Pl.'s Dep. 178:13-179:15, Feb. 19, 2015. Plaintiff testified that whenever a store was in bad shape or if there was a grand opening, "we [the supervisors] had to jump in and help the subcontractor." Pl.'s Dep. 181:10-14, 182:23-24, Feb. 19, 2015. Further, Plaintiff testified that because the subcontractors only had three days of training that "we had to keep training them and physically show them" how to use the equipment. Pl.'s Dep. 182:15-186:20, Feb. 19, 2015.

The week before Plaintiff resigned, S. Lutz met with Plaintiff and advised him that he was reconsidering his promise to make Plaintiff a regional manager because he was not doing a good job. Pl.'s Dep. 81:25-82: 24, Feb. 19, 2015. Plaintiff testified that Couture also stated that he did not want Plaintiff to be a regional manager. Pl.'s Dep. 82:24-83:14, Feb. 19, 2015. On April 19, 2013, Plaintiff wrote a letter to Human Resources about the events of April 12, 2013, and his one-day suspension. Pl.'s letter dated April 19, 2013, Ex. 6, ECF No. 35-5. Plaintiff

stated that on April 12, 2013, Couture had a meeting with him and four other supervisors to report that none of the supervisors were doing their jobs because they were not checking the equipment, as emphasized in various emails.  Id.  Plaintiff spoke up at the meeting because one of the enumerated emails related to his store and to issues that had been reported previously.  Id.  Couture then advised that Plaintiff was out of line, to get the aggressive look out of his face, and to not lean towards him.  Id.  Plaintiff states that in response, he stood up and "sarcastically said if he [Couture] wanted me [Plaintiff] further in the room [sic]."  Id.  Couture stated that he was going to write Plaintiff up for insubordination, and the two yelled at one another.  Id.  Couture phoned S. Lutz during the meeting and advised him of the situation.  Id.  Couture then brought in Kurt, a training supervisor, and advised Plaintiff that he was being issued a verbal warning for insubordination.  Id.  Plaintiff complained, in the letter, that he was not given a copy of Couture's statement of the events, and that S. Lutz advised Plaintiff that his chances as manager at ARC would be "nulled."[4]  Id.  Plaintiff wrote that this was in retaliation and that Couture may be involved in the money scam.  Id.  Plaintiff testified that Couture's actions on April 12, 2013, were harassment.  Pl.'s Dep. 120:21-25, April 29, 2015.  Plaintiff further testified that he suffered mental harassment by Defendants based on the mistreatment of other employees and/or subcontractors.  Pl.'s Dep. 115:1-120:20, April 29, 2015.

On April 25, 2013, Plaintiff served a one-day suspension without pay.  Pl.'s Dep. 80:19-24, 85:7-8, Feb. 19, 2015.  This was the only write-up Plaintiff had while employed at ARC.  Pl.'s Dep. 37:15-20, April 29, 2015.

---

[4] S. Lutz testified that Plaintiff was issued the suspension for the way he behaved in the meeting with the supervisors and Couture.  S. Lutz Dep. 116:10-117:13.  S. Lutz testified that he "never made a conscious decision all the way up until when [Plaintiff] quit not to make him a manager. Okay. I was hoping that his behavior would change and at some point we could move forward."  S. Lutz Dep. 245:5-13.

Plaintiff testified that the first conversation he had with anyone on April 26, 2013, was with Jesus Moreano.  Pl.'s Dep. 71:6-15, Feb. 19, 2015.  Mr. Moreano told Plaintiff that S. Lutz asked him to write Plaintiff up because Plaintiff had told Mr. Moreano that he was going to inform the Redner's supermarket owner about the wrongdoings at ARC.  Pl.'s Dep. 72:4-11, Feb. 19, 2015.  Plaintiff responded to Mr. Moreano that he did not care, and testified that even after this conversation, he had no intention of quitting his position at ARC.  Pl.'s Dep. 70:20-75:9, Feb. 19, 2015.

That day, five subcontractors called a meeting because money was being taken from them.  Pl.'s Dep. 17:1-22:9, 28:2-7, Feb. 19, 2015.  Plaintiff gave as an example the time ARC took $1,700 from one subcontractor and told him it was for insurance.  Pl.'s Dep. 42:5-18, Feb. 19, 2015.  Plaintiff spoke with some of the subcontractors after their meeting on April 26, 2013, and was advised that this subcontractor submitted proof from the bank that money had been wired into the bank account of Paul Hurtarte, who is a recruiter, at which time ARC refused to return the money and stated: "[N]ow you don't have insurance.  Now you are going to go get your own insurance."  Pl.'s Dep. 28:2-7, 78:1-10, Feb. 19, 2015; Couture's Dep. 13-17, May 28, 2015.  Plaintiff testified that another subcontractor advised him that at the meeting ARC offered the subcontractors more stores, but did not return the money that was taken.  Pl.'s Dep. 79:6-14, Feb. 19, 2015.

Plaintiff then left ARC and went to the Pennsylvania State Police Department to report ARC's wrongdoings.  Pl.'s Dep. 27:10-21, April 29, 2015.  the State Police advised Plaintiff to contact the Bath Township Police Department, which Plaintiff did on his drive back to ARC.  Id. When the Bath Township police detective advised Plaintiff that he could not help, Plaintiff returned to ARC and "just went and said here are the keys.  I'm not working for you anymore."

Pl.'s Dep. 27:20-25, April 29, 2015.  Plaintiff testified that all the events described above, and others, led to his decision to resign from ARC.  Pl.'s Dep.  80:10-24, 85:4-19, Feb. 19, 2015.  No one had ever explicitly threatened to fire Plaintiff.  Pl.'s Dep. 34:2-7, April 29, 2015.

After he "quit," Plaintiff contacted the FBI twice about ARC, Pl.'s Dep. 215:13-21, Feb. 19, 2015, and made a report to the IRS.  Pl.'s Dep. 216:17-23, 225:3-7, Feb. 19, 2015.  Prior to leaving ARC, Plaintiff had only contacted the Department of Labor regarding the perceived wrongdoings at ARC, which was sometime before December 2012.  Pl.'s Dep. 224:6-14, Feb. 19, 2015.  Plaintiff did not communicate with any other federal state, or local agency regarding ARC until the day he resigned.  Pl.'s Dep. 34:16-36:15, Feb. 19, 2015; Pl.'s Dep. 26:20-27:24, April 29, 2015.

### C.    Procedural History

Plaintiff initiated this action on September 16, 2014, by filing a Complaint asserting claims under the FLSA for unpaid overtime wages and retaliation resulting in constructive discharge, for alleged violations of Pennsylvania's Minimum Wage Act of 1968, 43 P.S. §§ 333.101- 333.115 (2015) ("PMWA"), for alleged violations of Pennsylvania's Wage Payment and Collection Law, 43 P.S. §§ 260.1-260.45 (2015) ("WPCL"), and for Unjust Enrichment.  An Answer with affirmative defenses was filed on December 5, 2014.

On July 15, 2015, Defendants filed a Motion for Summary Judgment.  Defs.' Mot. Summ. J.  In the Motion, Defendants argue that Plaintiff's claim for retaliation under the FLSA should be denied because Plaintiff resigned and is unable to show constructive discharge.  Id. ¶¶ 11-20.  Defendants assert that Plaintiff also fails to support an overtime claim under the FLSA because he is an exempt executive employee.  Id. at ¶¶ 21-27.  Defendants contend that the MWA claim similarly fails, and that without a breach of a contractual obligation to overtime

wages, the WPCL claim must also be denied.  Id. at ¶¶ 28-38.  Finally, Defendants assert that

Plaintiff's unjust enrichment claim fails because Plaintiff was not entitled to overtime wages and

because he had an oral agreement of employment pursuant to which he was paid the agreed upon

wages.  Id. at ¶¶ 39-45.

Plaintiff filed a brief in Opposition to Defendants' Motion for Summary Judgment on

August 12, 2015.  Pl.'s Br. Opp. Mot. Summ. J., ECF No. 34.  Plaintiff submits that Defendants

have not met their burden to establish no genuine issues of material fact as to whether he was an

exempt employee under the FLSA and MWA.  Id. at 4-9.  Plaintiff argues that there is also a

genuine issue of material fact as to his constructive discharge because he did not receive a

manager's position that was promised after complaining about subcontractor abuse.  Id. at 10-13.

Next, Plaintiff asserts that his Confidentiality and Non-Compete Agreement with ARC satisfies a

contractual obligation to compensation to support his WPCL claim, and that there is a genuine

issue of material fact as to whether he was entitled to overtime hours.  Id. at 13-14.  Finally,

Plaintiff concedes that summary judgment should be granted on his unjust enrichment claim.  Id.

at 14.

Defendants filed a reply brief on August 19, 2015.  Defs.' Reply Br., ECF No. 36.

On January 7, 2016, the parties entered a stipulation, which was adopted by the Court,

agreeing to dismiss with prejudice the FLSA retaliation claim.   Order, ECF No. 43.

## III.    STANDARD OF REVIEW

"Through summary adjudication the court may dispose of those claims that do not

present a 'genuine issue of material fact.'"  Ill. Union Ins. v. Hydro Int'l, PLC, 929 F. Supp. 2d

365, 371 (M.D. Pa. 2013) (quoting Fed. R. Civ. P. 56(c)).  Summary judgment "should be

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56; Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 851 (3d Cir. 1992).  "Inferences should be drawn in the light most

favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.   ANALYSIS

### A.   FLSA (Overtime) and PMWA

"The Fair Labor Standards Act and the Pennsylvania Minimum Wage Act mandate that employees be paid overtime wages above their standard hourly rate for every hour over forty worked per week, unless the employee falls within a statutorily exempt category." Kesselman v. Sanofi-Aventis United States LLC, No. 09-5446, 2012 U.S. Dist. LEXIS 45877, at *16 (E.D. Pa. Mar. 30, 2012). Exempted from the FLSA's minimum wage and maximum hour requirements is "any employee employed in a bona fide executive, administrative, or professional capacity . . . ." 29 U.S.C. § 213(a)(1).

Defendant asserts that Plaintiff is exempt from the FLSA and PMWA overtime requirements as an executive employee.[5] An employee employed in a bona fide executive capacity under the FLSA means any employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
(3) Who customarily and regularly directs the work of two or more other employees; and
(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

---

[5] Defendant does not contend that any other exemptions apply, and "the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof." Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974); Sander v. Light Action, Inc., 525 Fed. Appx. 147, 150 (3d Cir. 2013).

29 CFR 541.100.  The PMWA test provides that an employee will qualify as an executive employee "only if: (1) he has a primary duty consisting of management of the enterprise; and (2) this work includes the customary and regular direction of the work of two or more other employees."  Itterly v. Family Dollar Stores, Inc., No. 08-1266, 2014 U.S. Dist. LEXIS 12340, at *7-8 (E.D. Pa. Jan. 30, 2014) (discussing the short test for employees making greater than $250 per week and citing 34 PA. CODE § 231.82), affirmed by 606 Fed. Appx. 643, 649 (3d Cir. 2015).  See also Baum v. AstraZeneca LP, 372 Fed. Appx. 246, 248 n.4 (3d Cir. 2010) (noting that Pennsylvania courts have looked to federal law regarding the FLSA for guidance in applying the PMWA and have found it proper to give deference to federal interpretation of a federal statute when the state statute substantially parallels it).

The Court finds that the executive exemption does not apply because there is insufficient, if any, evidence that Plaintiff supervised "two employees" of ARC.  Rather, the evidence establishes that Plaintiff supervised sub-contractors, who are not included for purposes of this exemption.  See U.S. Department of Labor opinion letter FLSA2007-3; 69 FR 22122, 22135 (Apr. 23, 2004) (refusing to "expand the requirement to two or more 'individuals' so as to count the supervision of volunteers, contractors, and other non-employees" because the "FLSA itself defines the term 'employee' as an 'individual employed by an employer'"); Villegas v. Dependable Constr. Servs., No. 4:07-cv-2165, 2008 U.S. Dist. LEXIS 98801, at *49-50 (S.D. Tex. Dec. 8, 2008) (holding that subcontractors are not considered employees for the FLSA's executive exemption under 29 C.F.R. § 541.104(a)).  Therefore, Defendant's motion for summary judgment as to Counts 1and 3 is denied.

### B.        WPCL

"The WPCL does not create a right to compensation; it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P., No. 14-07204, 2015 U.S. Dist. LEXIS 124470, at *5-6 (E.D. Pa. Sept. 17, 2015) (citing De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003)). "Where an employee does not work under a written employment contract or collective bargaining agreement, the employee will have to establish the formation of an implied oral contract to recover under the WPCL." Oxner, 2015 U.S. Dist. LEXIS 124470 at *6.

Defendant asserts that the WPCL claim should be denied because there was no violation of the FLSA or PMWA and no contractual agreement.  Plaintiff responds that he can establish a contractual obligation flowing from the confidentiality and non-compete agreement, as well as the statutory obligation to receive overtime wages under the FLSA.

District courts in this Circuit have frequently denied WPCL claims based on alleged violations of federal law rather than on an express or implied employment contract.  See Carpenter v. R.M. Shoemaker Co., No. 00-5644, 2002 U.S. Dist. LEXIS 8566, at *19-20 (E.D. Pa. May 6, 2002) (granting the defendant's motion for summary judgment on the WPCL claim, which relied solely on the FLSA); Haluska v. Advent Communs., Inc., No. 2:13-cv-1104, 2014 U.S. Dist. LEXIS 158467, at *24-25 (W.D. Pa. Nov. 10, 2014) (collecting cases).  Accordingly, Plaintiff's reliance on the FLSA to support a contractual obligation for overtime wages is unpersuasive.  Further, the confidentiality and non-compete agreement makes no mention of overtime wages and therefore does not evidence a contractual agreement to pay overtime wages. See Pieretti v. Dent Enters., No. 11-2179, 2013 U.S. Dist. LEXIS 27244, at *9-10 (E.D. Pa. Feb. 26, 2013) (granting summary judgment in favor of defendants and rejecting the the plaintiff's

reliance on a signed written offer of employment to establish a contractual obligation to overtime wages), affirmed by 553 Fed. Appx. 244 (3d Cir. 2014) (agreeing that the plaintiff failed to produce any evidence of a contractual obligation to pay overtime wages).  Summary judgment will be granted as to this claim.

### C.      FLSA (Retaliation)

On January 7, 2016, the Court adopted the stipulation by the parties to dismiss the FLSA retaliation claim with prejudice.  ECF No. 43.  Accordingly, the request for summary judgment on this claim is moot.

### D.      Unjust Enrichment

Plaintiff concedes that summary judgment should be awarded on this claim.

## V.      CONCLUSION

For the reasons set forth in this Memorandum, Defendant's Motion for Summary Judgment is granted as to the WPCL claim and the claim for unjust enrichment, denied as to the overtime claims under the FLSA and PMWA, and denied as moot as to the FLSA retaliation claim that was previously dismissed with prejudice.

A separate order will be issued.


                                              BY THE COURT:


                                              /s/ Joseph F. Leeson, Jr.
                                              JOSEPH F. LEESON, JR.
                                              United States District Judge


16